IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | 12 CR 22-1 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| STEPHEN LINDER, | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

A federal grand jury indicted Defendant Stephen Linder, a Deputy United States

Marshal for the Northern District of Illinois, in a four count indictment charging that he

violated the civil rights of two individuals by using excessive force on two separate

occasions and then attempted to conceal or prevent information regarding those incidents

to be presented in the course of the investigation.  Specifically, the indictment alleges that

Linder struck and choked Individual SS  on July 8, 2010 (Count One) and head-butted

Individual EU on May 13, 2008 (Count Three) both in violation of 18 U.S.C. § 242 .  The

indictment also alleges that Linder then attempted to corruptly persuade two other

individuals, known respectively as Individual HS and Individual SM, to withhold evidence

concerning the incidents from federal authorities in order to hinder, delay, and prevent the

communication of a possible commission of a federal offense in violation of 18 U.S.C.

§ 1512(b)(3) (Counts Two and Four).  Linder moved to dismiss the Indictment (Doc. 26),

suppress all evidence obtained from the search of electronic devices seized by the government (Doc. 25), for a bill of particulars (Doc. 24), for disclosure of favorable evidence (Doc. 23), and for early return of trial subpoenas (Doc. 22).

In the government's response to Linder's Motion for the Early Return of Trial Subpoenas it requested that this Court order it to be able to issue subpoenas pursuant to Federal Rule of Criminal Procedure 17(c) as well. On June 13, 2012, the Court granted the Motion for the Early Return of Trial Subpoenas as to both sides. (Doc. 37). On the same day, the Court denied Linder's Motion for the Disclosure of Favorable Evidence as moot. (*Id*.). The remainder of Linder's motions are contested by the government.

## I. Motion for a Bill of Particulars

Linder first moves this Court for an order directing the government to provide him with a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) regarding Counts Two and Four of the indictment. Specifically, he seeks to have the Government identify the unlawful conduct charged, namely, the attempt to corruptly persuade Individual HS to withhold evidence that he allegedly engaged in on July 8, 2010 and the alleged attempt to do the same with Individual EU two years earlier.

The government counters that Linder has received substantial discovery regarding Counts Two and Four that included the internal investigation that the U.S. Marshal Service conducted after Individual EU filed a formal complaint against Linder. As part of that

investigation several individuals were interviewed, including Individual SM, and the entire file, including a transcript of the internal affairs investigators' interview of Individual SM has been provided to Linder. Furthermore, the government contends that it has agreed to Linder's request to provide *Jencks v United States*, 353 U.S. 657 (1957), and *Giglio v. United States*, 405 U.S. 150 (1972), materials at least thirty days before trial. The government asserts that in disclosing this additional material it will be providing additional information to Linder regarding Counts Two and Four.

A bill of particulars is only necessary in those circumstances in which an indictment lacks sufficient detail to allow a defendant to prepare for trial, avoid prejudicial surprise, or protect himself against double jeopardy. *See U.S. v. Glecier*, 923 F.2d 496, 502 (7th Cir. 1991). The test for whether a bill of particulars is "necessary is whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981) (internal citations and quotations omitted). An indictment that includes each of the elements of the charged crime, the time and place of the defendant's conduct which constitutes a violation, and a citation to the statute provides sufficient notice for the defendant to prepare for trial. *See United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003).

Although a defendant is not entitled to know all of the evidence that the government

intends to produce against him at trial; he is entitled to know only the theory of the government's case. *See Kendall*, 665 F.2d at 135. If that theory is known through some other satisfactory form such as discovery, the bill is not necessary. *See United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008). Usually, a bill of particulars is inappropriate if the defendant has access to the documents and witness statements which the government's case is built upon. *See Glecier*, 923 F.2d at 502.

Recognizing that the decision of whether or not to grant a bill of particulars lies within the sound discretion of the district court, and the decision will only be reversed if the defendant suffers actual prejudice from a denial of a motion for a bill of particulars, *see Glecier*, 923 F.2d at 501, the Court examines whether the indictment in this case provides Linder with sufficient notice to prepare for trial. With respect to Count Two, Linder has been able to identify the individual he is alleged to have attempted to corruptly persuade based on the evidence provided to him; yet, he is unable to identify the manner in which Linder allegedly corruptly persuaded HS. Corrupt persuasion can take many forms. What Linder claims he is not aware of are the specific acts that he allegedly committed which constituted the corrupt persuasion. Similarly, with respect to Count Four, Linder has been able to identify the individual he has allegedly corruptly persuaded, but he is not certain of the means that he did so, since the indictment is void of any facts alleging how he did so.

According to Linder, not only does the discovery tendered by the government to date not provided sufficient detail to allow him to prepare for trial, the reports provided actually provide conflicting information. For example, as to Count Four Linder alleges that the internal affairs investigation provides a report of Individual SM's testimony that the government alleges reveals to him the corrupt persuasion, when in fact, the testimony actually exonerates him with respect to the assault charged in Count Three. As such, the information provided has failed to give Linder the detail necessary to prepare for his defense since he cannot ascertain the means by which he is alleged to have corruptly persuaded the two individuals in the Indictment.

In charging an obstruction count an indictment is sufficient when it provides the charging statute, the elements of the offense, and sufficient detail to provide notice to the defendant of the charges against him. *See Fassnacht*, 332 F.3d at 444-447. In *Fassnacht*, the defendants were charged with, among other things, violating 18 U.S.C. § 1503 for obstructing the grand jury investigation of their alleged crime, tax evasion. *See Id.* at 444. Noting that a conviction under § 1503 requires a specific intent to impede the grand jury, the defendants argued that the indictment was deficient because it did not refer to an act or endeavor specifically aimed at the grand jury investigation. *See Id.* In the alternative, the defendants claimed that they were entitled to know the specific acts that the government believed they undertook in violation of § 1503. *See Id.* at 446-447. The Seventh

Circuit rejected both of these arguments and held that no bill of particulars was necessary because the indictment provided the charging statute, the elements of the offense, and sufficient detail to put the defendants on notice. *See Id.* at 444-447. Here, unlike in *Fassnacht*, Linder has no knowledge of the specific acts that form the basis of the obstruction charges contained in Counts Two and Four because he has not received sufficient details to prepare for trial through the Indictment and discovery. The Indictment in the present case provides the charging statute and the elements of the offense. What the discovery and the Indictment do not provide is sufficient detail to put Linder on notice of how he committed the charges against him. *See Id*. For the foregoing reasons, Linder's Motion for a Bill of Particulars is granted. The government is ordered to furnish Linder with a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) with respect to Counts Two and Four of the Indictment by providing him with the means by which he corruptly persuaded Individual HS and Individual SM on July 8, 2010 and June 2008 respectively.

## II. Motion to Suppress

Linder moves to suppress the information that was obtained by the government from a search of his Blackberry smart device and the electronic files contained on the government server. Linder claims that the search at issue was an illegal warrantless search in violation of the Fourth Amendment. Linder claims that he had a legitimate subjective

expectation of privacy in his digital information and that this expectation of privacy is one that society is prepared to recognize as reasonable. As such, Linder requests that this Court suppress all of the evidence obtained by the government through its search of his Blackberry and computer files stored on the government server, as well as the poisonous fruits of this allegedly illegal search.

## A. Facts Regarding the Searches

Linder is charged with, *inter alia*, two counts of violating 18 U.S.C. § 242 for using excessive force against a handcuffed civilian, once in 2010 and once in 2008. In the 2010 incident another officer confronted Linder immediately after the assault. According to the government, in an attempt to placate that officer Linder sent him a series of instant messages from his government-issued Blackberry smart phone. On July 16, 2010, the Office of Internal Investigation referred the incident to the Office of the Inspector General of the Department of Justice ("OIG"), and ten days later the OIG confirmed that it would handle the investigation into the matter. Special Agent Kevin Shirley of the OIG Chicago Field Office began to participate in the investigation of Linder. On September 27, 2010, following the initiation of the criminal investigation by the Department of Justice and the OIG, Linder was directed into his supervisor's office where he was ordered to turn over his government-issued Blackberry. Immediately thereafter Agent Shirley sent Linder's Blackberry to the OIG Dallas Field Office for forensic testing and analysis. The Dallas office

received the Blackberry on September 30, 2010. Agent Shirley instructed the forensic examiner that the smart phone contained evidence of an assault committed by Linder on a civilian. The Blackberry was searched and imaged, and the Dallas office completed a forensic report that contained all of the information requested by Shirley. The evidence gathered from the government's search was attached to the forensic report prepared by the Dallas office. The information culled from the Blackberry by the Dallas office included Linder's personal pictures, emails, text messages, and contacts.

Also, on August 16, 2010, Agent Shirley of the OIG requested Linder's emails that were stored on the government server from July 1, 2010 through August 21, 2010. On March 21, 2011, the OIG renewed its request for copies of Linder's emails on the server from June 23, 2010 through that date because it appeared that some emails were missing. The OIG also received, without a specific request, a copy of documents and other computer files that Linder chose to place on the government server when it received a copy of Linder's emails.

Agents did not inspect each and every document, but instead used the alleged victim's last name as a search term to find relevant documents. That search brought up a document entitled "debacle." Upon initial inspection, the file, which was not password-protected, appeared to be Linder's own first-hand account of the events that form that basis of Counts One and Two of the Indictment. In an abundance of caution, the government

agents stopped reading the document and sent it to a taint team for review. To this day the prosecution team, comprising the Assistant United States Attorney from the Department of Justice as well as those members of the trial team acting under his direction, state that it has not read an un-redacted copy of the "debacle" file. During the investigation the government did not inspect Linder's government-issued computer, and therefore never recovered any data that was saved exclusively on his hard drive. The only computer files searched were retrieved from the government servers.

**B. Private Use of the Government-Issued Electronic Equipment**

As for the computer equipment issued to Linder, the Department of Justice ("DOJ") issued policies notifying all employees that they have no expectation of privacy when they access the DOJ's computer information system. Specifically, the first sentence of the DOJ computer usage policy states: "This Order states the Department's policy on the use of departmental computers and computer systems, *the lack of expectation of privacy with respect to such use, and authorized monitoring or access to information on departmental computers and computer systems*." (Doc. 31; Exhibit 3) (emphasis supplies). The U.S. Marshals Service ("USMS") has also implemented policies that also state that there is no expectation of privacy in the use of USMS-provided computer information systems. The USMS Internet Usage Policies and Monitoring states, in part, that "[e]mployees should be aware of *lack of expectation of privacy with respect to such use and on the authorized monitoring* or access to

information on departmental computers and computer systems."  (Doc. 31; Exhibit 4) (emphasis supplied).  That policy also states in relevant part:

> Employees are reminded that *there is no expectation of privacy in the use of government computers or computer systems.  The Department may access e-mail messages or other documents on government computer systems whenever it has a legitimate governmental purpose for doing so.*  To the extent that employees wish that their private activities remain private, they should avoid using departmental computer systems for such activities.

(*Id.*) (emphasis supplied).  A USMS Policy Directive further provides that "[t]he use of a USMS computer or telecommunications system, including a personal computer connected to the USMS or DOJ network, *constitutes consent to monitoring.*"  (Doc. 31; Exhibit 5) (emphasis supplied).

An employee is reminded of these policies via banner each time he logs on to use his government-issued computer or Blackberry.  The computer banner states, in part:

> Warning: You are accessing a U.S. Government information system, which includes: (1) this computer; (2) this computer network; (3) all computers connected to this network; and (4) all devices and storage media attached to this network or to a computer on this network.  This information system is provided for U.S. Government-authorized use only. . .By using this information system, you understand and consent to the following: *You have no reasonable expectation of privacy regarding any communication transmitted through or data stored on this information system.  At any time, the government may monitor, intercept, search and/or seize data transmitting or stored on this information system.*

(Doc. 31; Exhibit 6) (emphasis supplied).  The log-on banner for the Blackberry states, in relevant part: "WARNING[:] This is US Government Property.  *Use is subject to monitoring.*"

(Doc. 31; Exhibit 7) (emphasis supplied).

Each year, Linder was required to undergo Computer Security Awareness Training. In 2009, for example, the training program reminded attendees that they had no expectation of privacy "as to any communication on or information stored within the system" and that this applied to all emails. (Doc. 31; Exhibit 8). The training also detailed the General Rules of Behavior, which include, in relevant part, "[u]se DOJ information systems for lawful, official use and authorized purposes in accordance with current guidelines. . .Read and understand the DOJ standard network security warning banner prior to logging on to the network." (*Id*.). As part of the Computer Security Awareness Training, Linder was required to click a button that stated, in relevant part, "I acknowledge receipt of those ROB and understand my responsibilities as identified in the October 1, 2008, General Rules of Behavior for DOJ systems." (*Id*.). Linder certified that he took the Computer Security Awareness Training on April 21, 2009. (Doc. 31; Exhibit 9). He recertified that he took subsequent Trainings on April 22, 2010 and April 8, 2011. (*Id*.). The facts that the DOJ and the USMS issued policies that Linder was aware of, that banners and warnings were displayed on Linder's government-issued devices, and that Linder was required to attend Computer Security Awareness Trainings are not contested by Linder.

## C. Legal Standard - Privacy Interest

Linder's Motion to Suppress is governed by the warrant requirement contained in

the Fourth Amendment's Warrant Clause, and the exclusionary rule that applies to illegal warrantless searches in pending criminal matters. *See Weeks v. United States*, 232 U.S. 383 (1914) (the exclusion of evidence obtained in violation of the Fourth Amendment is the appropriate remedy in federal criminal prosecutions); *Mapp v. Ohio*, 367 U.S. 643 (1961) (applying the exclusionary rule for violations of the Fourth Amendment to state proceedings). The Fourth Amendment to the Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. The Fourth Amendment's warrant requirement is triggered if the government's conduct at issue infringes upon "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobson*, 466 U.S. 109 (1984).

Whether a defendant can validly claim the Fourth Amendment's protections is governed by a two-step inquiry. First, the person must have an actual or subjective expectation of privacy, and second that expectation must be one that society is prepared to recognize as reasonable. *See United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007). If the government's conduct does not violate a person's reasonable expectation of privacy, then it does not constitute a Fourth Amendment search and accordingly no

warrant is required.  *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983).  The burden of proving a reasonable expectation of privacy rests with the defendant.  *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Carlisle*, 614 F.3d 750, 758 (7th Cir. 2010).

Public employees can have Fourth Amendment rights in the workplace.  *See O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).  Whether a public employee has a reasonable expectation of privacy depends on the context of the employment relationship and must be determined on a case-by-case basis.  *See Id.* at 717-718.  A public employee's Fourth Amendment rights are not absolute and can be diminished by the actual practices and policies of the workplace at issue.  *See Id.* at 717.  "Public employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practice and procedures or *by legitimate regulation*."  *Id*. (emphasis supplied).  In *Ontario v. Quon*, 130 S.Ct. 2619, 2630 (2010), the Supreme Court held that "employers policies concerning communications will of course shape the reasonable expectations of their employees, especially to the extent that such policies are clearly communicated."  *See also Muick v. Glernaryre Electronics*, 280 F.3d 741, 743 (7th Cir. 2002) (an employee has no right to privacy in an employer-provided laptop computer where the employer has a policy in place stating that it can inspect the laptops; the policy destroys any reasonable expectation of privacy the employee might have and therefore does not implicate Fourth Amendment concerns).

Courts have likewise deferred to public employers' official policies that expressly authorize access to the employee's workplace and have used such policies to rule that the employee does not retain a reasonable expectation of privacy in their workplace. *See American Postal Workers Union, Columbus Area Local AFL-CIO v. United States Postal Serv.*, 871 F.2d 556, 559-561 (6th Cir. 1989) (postal employees do not have a reasonable expectation of privacy in the contents of their government lockers upon signing waivers stating that lockers are subject to inspection at any time, even though lockers contain personal items); *United States v. Bunkers*, 521 F.2d 1217, 1219-1221 (9th Cir. 1975) (postal employees do not have a reasonable expectation of privacy in the contents of their government lockers, even when the lockers contain personal items, when language in postal manual states that the locker is "subject to search by supervisors and postal inspectors"); *see, e.g., Chicago Fire Fighters Union, Local 2 v. City of Chicago*, 717 F. Supp. 1314, 1319 (N.D. Ill. 1989) (firefighters do not have a reasonable expectation of privacy when a General Order is issued by the Fire Chief stating that firefighters' lockers would be searched without a warrant to discover violations of rules and regulations).

Government employees do not maintain a reasonable expectation of privacy in the information stored on their computers when the employee is notified that their employer has retained the right to access or inspect the information stored there. *See United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000). In *Simon* computer specialists at the CIA learned

that the defendant, a CIA employee, had been using his work computer to obtain child pornography in violation of CIA policy and federal law. *See Id.* at 396. Computer specialists accessed Simon's computer remotely without a warrant and obtained copies of pornography that he had stored on his hard drive. *See Id.* at 396-397. At trial Simon filed a motion to suppress the fruits of the remote search. The trial court denied the motion which was later affirmed by the Fourth Circuit holding that the CIA division's official Internet usage policy eliminated any reasonable expectation of privacy that a defendant might otherwise have had in the files contained on his hard drive. *See Id.* at 398.

Courts have similarly held that banners and policies generally eliminate a reasonable expectation of privacy in the contents stored in a government users' network account. *See Biby v. Board of Regents*, 419 F.3d 845, 850-851 (8th Cir. 2005) (state university policy stating that computer files and emails may be searched in response to litigation requests eliminates user's reasonable expectation of privacy); *United States v. Thorn*, 375 F.3d 679, 683 (8th Cir.2004), *cert. granted and judgment vacated on other grounds*, 543 U.S. 1112 (2005) (computer use policy eliminates government employee's reasonable expectation of privacy in the contents of the computer); *United States v. Angevine*, 281 F.3d 1130, 1134-1135 (10th Cir. 2002) (banner and computer policy eliminates a state university professor's reasonable expectation of privacy in data downloaded from the Internet); *United States v. Monroe*, 52 M.J. 326, 330 (C.A.A.F. 2000) (an Air Force sergeant does not maintain a reasonable

expectation of privacy in his government email account because email use is reserved for official business and because network banner informed each user upon logging on to the network that their use was subject to monitoring); *see, e.g., United States v. Hamilton*, 778 F. Supp. 2d 651 (E.D. Va. 2011) (public school employee lacked an objectively reasonable expectation of privacy in emails with his wife that were stored on his work computer because the computer use policy stated that contents of the computer were subject to inspection, defendant signed forms acknowledging the policy, and a computer banner informed him of this policy each time he logged onto the system); *Wasson v. Sonoma County Junior College Dist.*, 4 F. Supp. 2d 893, 905-906 (N.D. Cal. 1997) (public employer's computer policy giving the employer the right to access all information stored on the employer's computers eliminates an employee's reasonable expectation of privacy in files stored on the computers); *Bohach v. City of Reno*, 932 F. Supp. 1232, 1235 (D. Nev. 1996) (police officers do not retain a reasonable expectation of privacy in their use of a pager system in part because the Chief of Police issued an order announcing that all messages would be logged).

The DOJ and the USMS have articulated clear policies stating that employees do not have a reasonable expectation of privacy when they access the DOJ's or USMS's computer information systems. Furthermore, Linder was warned on multiple occasions that he had no legitimate expectation of privacy when he accessed the government's computer information system. Given these policies and warnings, Linder cannot credibly claim that

he subjectively believed that his use of his government-issued data devices was private.

Linder's argument to support his belief that his use of the devices was private is grounded in the fact that he kept personal videos and pictures of his friends and family on his Blackberry and that when he was ordered to give it to investigators he expressed a desire to retain the personal data on it. Maintaining personal pictures on his Blackberry and showing a reluctance to surrender it, however, does not establish that Linder subjectively believed that the data stored on his Blackberry was private. No evidence has been presented to the Court to support the conclusion that Linder did not believe the warnings and policies that he accepted informing him that he did not have a reasonable expectation of privacy in accessing and using the government's computer network system.

## D.  Subjective Expectation of Privacy

Linder next asserts that he believed that the electronic data that he chose to store on the server was private. Linder had access to at least two servers, an S drive, for shared files and information, and an H drive for personal use. Linder claims that his use of the H drive was for purely personal use and that he maintained a reasonable subjective expectation of privacy in the files contained there. Though Linder may have believed that he had a reasonable expectation of privacy in the H drive, he has not supplied an affidavit to support that allegation. Because Linder has the burden of proving that he had a legitimate expectation of privacy he must submit an affidavit to support his allegation that he had

such a privacy interest in the H drive in order for the Court to grant a suppression hearing on the issue. *See United States v. Ruth*, 65 F.3d 599, 604-605 (7th Cir. 1995) (agreeing with the district court that without an affidavit from the defendant it is impossible to find a privacy interest because such an interest depends, in part, on the defendant's subjective intent and the actions that manifest that intent); *United States v. Woods*, 995 F.2d 713, 715 (7th Cir. 1993) (the district court is only required to grant a suppression hearing when the defendant presents evidence that there are disputed issues of material fact by doing more than merely giving his version of the events); *United States v. Randle*, 966 F.2d 1209, 1212-1213 (7th Cir. 1992) (defendant must present the court with an affidavit in order to obtain an evidentiary hearing on a motion to suppress, the allegations of which are "definite, specific, detailed, and nonconjectural"). Linder has not done that. Linder provides no evidence to support his claim, and to the contrary the USMS IT manuals and policies clearly state that employees have no reasonable expectation of privacy in their use of government computer systems, which the Court concludes includes the H drive. Indeed, in his Motion to Suppress Linder admits that he "erroneously" believed that the H drive was a private space to store personal data. USMS also instructed employees that "[t]o the extent that employees wish that their private activities remain private, they should avoid using departmental computer systems for such activities." (Doc. 31; Exhibit 4). Thus, it is the explicit and clearly expressed policy of the USMS that if its employees wish to retain

privacy in their personal data they should refrain from using the USMS information network system altogether. Furthermore, Linder did not take any measures that manifest an intention to keep his documents private, such as saving materials on his hard drive or password-protecting his documents. Indeed, the document at issue here, the "debacle" file, was not password-protected. Rather, Linder placed his documents on the government server where they could be easily accessed. The "debacle" file was at one point saved on the H drive as well as on a removable memory stick. The fact that Linder's documents were stored on the server meant that they could be accessed readily and without detection by others.

Defendants lack a reasonable expectation of privacy in computer files that are maintained on shared networks or that are stored for sharing. *See United States v. King*, 509 F.3d 1338, 1341-1342 (11 Cir. 2007) (defendant does not have a legitimate expectation of privacy in the contents of a shared drive of his laptop while it is connected to the Internet); *United States v. Barrows*, 481 F.3d 1246, 1249 (10th Cir. 2007) (defendant has no reasonable expectation of privacy where he networks his computer for the express purpose of sharing files); *see, e.g., United States v. Stults*, No. 8:07CR199, 2007 WL 4284721, *1 (D. Neb. Dec. 3, 2007) (defendant has no reasonable expectation of privacy in computer files that he makes available using peer-to-peer file sharing). Linder's government-issued Blackberry is designed to link to the government's information servers. Thus, Linder lacked a reasonable

expectation of privacy in the contents of his government-issued Blackberry and the files that he placed on the government's information network system.

Assuming *arguendo* that Linder sincerely believed that his use of his government-issued Blackberry and the government server were private, he must still overcome the hurdle that this expectation of privacy is one that society is prepared to recognize as reasonable. *See Amaral-Estrada*, 509 F.3d at 827 (for the protections of the Fourth Amendment to be triggered the party moving to suppress evidence obtained without a warrant must demonstrate not only that he had an actual or subjective expectation of privacy, but also that the expectation is one that society is prepared to recognize as reasonable). Federal law enforcement officials' use of public resources is not private for compelling reasons: as a federal law enforcement officer, Linder's electronic data is potentially discoverable for any pending case or it may be compelled to be disclosed pursuant to a request under the Freedom of Information Act. *See Quon*, 130 S.Ct. at 2629 (in determining whether text messages are private it is necessary to consider whether pager messages sent to officers while on duty might be justified for reasons including performance evaluations, litigation concerning the lawfulness of police actions, and compliance with open records laws). Any privacy interest Linder may have subjectively believed he had in his Blackberry and files stored on the government server is not a legitimate privacy interest that society is prepared to recognize as reasonable. *See*

*O'Connor*, 480 U.S. at 717 (public employees do not have a legitimate expectation of privacy that society is prepared to recognize as reasonable in the workplace where their office is continually entered by fellow employees and other visitors during the workday for conferences, consultations, and other work related visits; likewise, public employees do not have a legitimate expectation of privacy that society is prepared to recognize as reasonable when their supervisor limits their privacy by express policy); *Angevine*, 281 F.3d at 1134 n.1 (public employee does not have a legitimate expectation of privacy that society is willing to recognize as reasonable in his use of a computer furnished to him by the state); *United States v. Gonzalez*, 328 F.3d 543, 548 (9th Cir. 2003) (hospital employees do not have a legitimate expectation of privacy that society is prepared to recognize as reasonable against being videotaped in a mailroom where government agents stroll nearby); *see, e.g., Chicago Fire Fighters Union, Local 2*, 717 F. Supp. at 1319 (firefighters do not have a legitimate expectation of privacy that society is prepared to recognize as reasonable when a General Order is issued by the Fire Chief stating that firefighters' lockers would be searched without a warrant to discover violations of rules and regulations). Here, as in *Angevine*, 281 F.3d at 1134 n.1, Linder's Blackberry was furnished to him by the government. Furthermore, files stored on the government server are readily accessible to other USMS employees, like the conditions discussed in *O'Connor*, 480 U.S. at 717, and *Gonzalez*, 328 F.3d at 548. In addition, the DOJ and the USMS have clearly stated policies that any

activity on the government network or in government-issued devices is subject to monitoring and that use of these technologies is not governed by any reasonable expectation of privacy, similar to the privacy policies discussed in *O'Connor,* 480 U.S. at 717, *Angevine,* 281 F.3d at 1134 n.1, and *Chicago Firefighters Union,* 717 F. Supp. at 1319. Thus, if Linder subjectively believed that he had a legitimate expectation of privacy in his Blackberry and computer files stored on the government server such an expectation of privacy it is not one that society is prepared to recognize as reasonable.

In his Motion to Suppress Linder fails to cite any authority holding that an employee has a reasonable expectation of privacy despite clear policies from the employer that state otherwise. The case law cited above requires the opposite conclusions; where employees are on notice by their employers' clearly stated policies that they have no reasonable expectation of privacy in their data usage, then they cannot later claim to have such a reasonable expectation. In his reply, Linder relies significantly on a case from the United States Court of Appeals for the Armed Forces, *United States v. Long,* 64 M.J. 57 (C.A.A.F. 2006). In *Long* the court held that a member of the Navy had a reasonable expectation of privacy in the emails she sent over the government's server notwithstanding a banner advising her that she had no legitimate expectation of privacy and that her use of the network was subject to monitoring. *See Id.* at 60. The court held that Long had a subjectively reasonable expectation of privacy in the emails because the military's policy,

as expressed in the banner "described access to 'monitor' the computer system, not to engage in law enforcement intrusions by examining the contents of particular emails in a manner unrelated to maintenance of the e-mail system." *Id.* at 63.

By contrast, here the USMS policy stated that "[t]he Department may access e-mail messages or other documents on government computer systems *whenever it has a legitimate governmental purpose for doing so.*" (emphasis supplied). Thus *Long* is clearly distinguishable from the instant case. Gathering evidence of suspected unlawful behavior by a member of the USMS constitutes a legitimate governmental purpose within the meaning of the USMS policy. Because Linder had no legitimate expectation of privacy in his use of his government-issued Blackberry and his files stored on the government server, the government did not violate the Fourth Amendment when it retrieved the data from Linder's Blackberry and his files from the government server.

Even if the Court were to assume that the Fourth Amendment protects Linder's privacy interests in his government-issued Blackberry and files stored on the government server, the government's search would need to be "per se unreasonable" unless the search fell within one of the "specifically established and well-delineated exceptions," where no warrant is required. *Katz v. United States*, 389 U.S. 347, 357 (1967). Two exceptions to the warrant requirement apply in this case: the "special-needs" exception that applies to government searches regarding work-related misconduct, and consent.

### i. Special Needs Exception

Employer conducted searches of the work-related misconduct of public employees, who may maintain a legitimate expectation of privacy in the workplace, must be judged by a standard of reasonableness under the circumstances of the case. *See O'Connor*, 480 U.S. at 725-726. Employee work-related misconduct searches are reasonable, and thus not subject to the warrant requirement, if they pass a two-part test. First, the search must be reasonable at its inception, meaning that there are reasonable grounds to believe that the search will turn up evidence of work-related misconduct. *See Id*. at 726. Second, the search must be reasonable in its scope, which is demonstrated when the measures adopted are reasonably related to the purpose of the search and not excessively intrusive in light of the nature of the alleged employee misconduct. *See Id*.

A workplace search still falls within the *O'Connor* framework even if the purpose of the search is to discover evidence of criminal activity. *See Simon*, 206 F.3d at 400. The court in *Simon* assumed that the primary purpose of the warrantless search by the CIA of the defendant's office was to discover evidence of criminal wrongdoing and found that the search fell within the *O'Connor* framework because the employer "did not lose its special need for the efficient and proper operation of the workplace merely because the evidence obtained was of a crime." *Id*. *See also United States v. Fernandes,* 272 F.3d 938, 942-943 (7th Cir. 2001) (an administrative workplace misconduct search by a county prosecutor into

allegations of bribery against his deputy prosecutor is reasonable under *O'Connor* even though the search includes looking for evidence of violations of criminal law); *Gossmeyer v. McDonald*, 128 F.3d 481, 492 (7th Cir. 1997) (a legitimate warrantless search looking for evidence of work-related misconduct is *not* transformed into an illegitimate law enforcement search merely by virtue of the presence of law enforcement officers in the search team); *United States v. Nasser*, 476 F.2d 1111, 1123 (7th Cir. 1973) (upholding warrantless electronic surveillance of government employee that provides evidence of criminal activity where the government is investigating work-related misconduct).

In this case, the allegations against Linder constitute violations of both USMS agency policies as well as federal criminal law. From the inception of the investigation, the USMS Office of Inspection, the internal USMS unit charged with investigating workplace misconduct, opened a file against Linder that paralleled the criminal investigation and assisted DOJ-OIG with its investigation. Hence, the *O'Connor* framework applies to this case, and the search was a legal warrantless search if it passes the reasonableness standard of *O'Connor*. *See Driebel v. City of Milwaukee*, 298 F.3d 622, 639-640 (7th Cir. 2002) (internal investigations designed to uncover evidence of work-related misconduct by government employees can parallel criminal investigations, although the seizure of a government employee subject to a criminal investigation must be supported by probable cause); *United States v. Slanina*, 283 F.3d 670, 680 (5th Cir. 2002), *vacated on other grounds, Slanina v. United*

*States*, 537 U.S. 802 (police officer conducting a search for workplace misconduct is reasonable under *O'Connor*, even where the search turns up evidence of criminal wrongdoing); *Shields v. Burge*, 874 F.2d 1201, 1204 (7th Cir. 1989) (ongoing internal investigation that parallels criminal investigation is subject to the *O'Connor* framework); *United States v. Nechy*, 827 F.2d 1161, 1163 (7th Cir. 1987) (an objectively reasonable administrative search will not be transformed into an illegitimate law enforcement search merely because evidence of criminal wrongdoing is discovered in conducting the administrative search).

Here, the search passes the *O'Connor* reasonableness test. The search was reasonable at its inception because there was a credible allegation that Linder used excessive force. *See Shields*, 874 F.2d at 1204 (in determining the reasonableness of a workplace search of a police officer the credibility of the allegations against the employee is a factor for the court to consider). The government's search of Linder's Blackberry was reasonable because the government had reason to suspect that Linder used the device to communicate with a witness regarding the assault alleged in Count I of the indictment. *See Gossmeyer*, 128 F.3d at 491 (if there are reasonable grounds to believe that a search will uncover evidence of misconduct then the search is justified at its inception). The search of Linder's emails copied from the government server was reasonable because the government had reason to believe that Linder was communicating with other witnesses and engaging in

obstructive conduct. *See Id.* That search was also reasonable in its scope because the emails were taken remotely from the server with no intrusion to Linder, and was limited to a time frame surrounding the incident, July 1, 2010 through the time of the request. *See Id.* at 491 (search is reasonable in its scope when there is limited intrusion on the person being searched and the search does not stray far from the relevant area where evidence of misconduct might be found). The search was limited to encompass only the incident and any obstructive activity afterwards, a factor pointing towards its reasonableness. *See Id*. Although the government did not request Linder's computer files on the server, the search of Linder's computer files was non-intrusive because the files were copied from the server. That search was also reasonably calculated to find only relevant documents using a search term to isolate them. *See Id*. Thus, the search of Linder's Blackberry and files stored on the government server were part of an employer conducted search for work-related misconduct, and thus within the scope of *O'Connor*, notwithstanding the fact that the search turned up evidence of criminal misconduct and was conducted parallel to a criminal investigation into the same matter. Furthermore, the search passes the reasonableness standard because it was reasonable at its inception and reasonable in its scope. Therefore, even assuming that Linder's Fourth Amendment rights are implicated by the government's activity in this case—a proposition which this Court doubts—the search is still not subject to the Fourth Amendment's warrant requirement because it falls into the "special-needs"

exception that applies to government searches regarding work-related misconduct.

### ii. Consent

Again, even if the Court were to assume that the Fourth Amendment protects Linder's privacy interests in his government-issued Blackberry and files stored on the government server, the government would not have violated Linder's Fourth Amendment rights if Linder voluntarily consented to the search. The government is free to search a place or object without a warrant or probable cause if a person with authority voluntarily consents to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent can be implied from the circumstances and may be manifested in a verbal or a non-verbal manner. *See United States v. James*, 571 F.3d 707 (7th Cir. 2009). DOJ Order 2740.1A states that "[u]se of departmental computer systems constitutes consent to monitoring and disclosure of information stored on or transiting the departmental computer system as provided below. The Department routinely conducts monitoring and intercepts communications for security purposes and to detect improper use." (Doc. 31; Exhibit 3). The USMS policy also emphasizes that by using the Department's system, Linder consented to monitoring. The relevant USMS policy states that "[e]mployees should also be aware that the use of departmental computer systems constitutes consent to monitoring to identify improper use and to ensure that system service remains available and functioning properly for all users." (Doc. 31; Exhibit 5). Thus, per DOJ and USMS policies

Linder consented to the search of his computer and Blackberry by using them. *See Biby*, 419

F.3d at 850-851 (8th Cir.2005) (no reasonable expectation of privacy exists where a policy

reserves the employer's right to search an employee's computer for a legitimate reason);

*Thorn*, 375 F.3d at 683 (a public agency's computer use policy, which prohibits accessing

sexual images, expressly denies employees any personal privacy rights in the use of the

computer systems, and provides the employer the right to access any computer in order

to audit its use, thereby precludes any reasonable expectation of privacy in the contents of

the computer); *Angevine*, 281 F.3d at 1122-1135 (employer's computer use policy, which

includes monitoring and right of access to equipment, and the employer's ownership of the

computer defeats any reasonable expectation of privacy the employee might have in the

computer); *Muick*, 280 F.3d at 743 (employer's declaration that it could inspect the laptops

furnished for its employees' use destroys any reasonable expectation of privacy that the

employees may have in the computers); *see, e.g., United States v. Bailey*, 272 F. Supp. 2d 822,

824 (D. Neb. 2003) (an employee has no expectation of privacy in his work computer when

he acknowledges every time he accesses the computer that he is giving his consent to its

search). Furthermore, because the Blackberry and computer files were within the control

of Linder's employer, his employer can give consent to search them. *See United States v.*

*Ziegler*, 474 F.3d 1184, 1191 (9th Cir. 2007) (employer can give consent to search an

employee's computer because the computer is the type of workplace property that remains

within the control of the employer even if the employee has placed personal items in it). Therefore, even if Linder had Fourth Amendment interests against the government searching his Blackberry and computer files stored on the government server, Linder consented to the search of these devices by using them in compliance with DOJ and USMS policies thereby waiving his consent to searches of them and thus no warrant was required.

### E. Equal Protection

In his reply to the government's response Linder advances a novel equal protection argument. Linder argues that the government has discriminated against him on the basis of his status as a federal employee. He suggests that if he were a private citizen the government would not have been able to conduct the search it conducted, and therefore that his status as a federal employee deprived him of the equal protection of the laws. He asserts that the DOJ and USMS policies were imposed upon him per the requirements of his employment. The conduct at issue here concerns federal action, and therefore implicates only the Fifth Amendment, which does not contain an Equal Protection Clause as is found in the text of the Fourteenth Amendment. Nevertheless, the Supreme Court has read into the Fifth Amendment an equal protection component that applies to action by the federal government. *See Bolling v. Sharpe*, 347 U.S. 497 (1954); *see also Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment"). Finding it "unthinkable" that the same

Constitution that applies in equal force to both federal and state governments would impose a lesser duty on the federal government with respect to the equal protection of the laws, the Supreme Court has examined action by the federal government to ensure that it treats similarly situated people alike. *See Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 215-218 (1995) (quoting *Bolling*, 347 U.S. at 500) (detailing the history and evolution of the Fifth Amendment's equal protection component). Courts apply the same approach to equal protection claims brought under the Fifth Amendment as that which is applied to analyze a claim against state action brought under the Fourteenth Amendment. *See United States v. Nagel*, 559 F.3d 756, 760 (7th Cir. 2009) (quoting *Weinberg v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)). Equal protection of the laws requires the government to treat all persons who are similarly situated alike. *See Plyler v. Doe*, 457 U.S. 202, 216 (1982). Where the government action at issue neither distinguishes along suspect classifications nor infringes upon a fundamental constitutional right, rational basis review serves as the governing standard by which the government's conduct is evaluated by a court. *See F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

On rational basis review, the plaintiff must prove that (1) the state actor intentionally treated him differently from other similarly situated individuals; (2) that this difference in treatment was caused by the plaintiff's membership in the class to which he belongs; and (3) that this difference in treatment was not rationally related to a legitimate state interest.

*See Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009). On rational basis review the classification at issue bears a strong presumption of validity and one attacking the rationality of the classification has the burden to negate every conceivable basis which might support it. *See F.C.C.*, 508 U.S. at 315. Equal protection for rational basis review does not demand that the governing decisionmaker or state actor actually articulate at any time the rationale or purpose supporting its classification. *See Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992). A government's choice to classify "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *F.C.C.*, 508 U.S. at 315. With its presumption in favor of constitutionality, rational basis review is "a paradigm of judicial restraint." *Id.* Government action is constitutional under rational basis review when "there is any reasonably conceivable state of facts that could provide a rational basis" to support the act. *Id.* at 313.

Here, Linder argues that the ability of the government to conduct the search the way it did unconstitutionally classified on the basis of his employment status. In essence, he argues that a similarly situated private employee could not have been subject to the same treatment as he was in his capacity as a federal employee. Therefore, Linder argues that the government action at issue here impermissibly discriminated against him on the basis of his employment status as a federal employee, without any rational relation to a legitimate state interest. Linder correctly notes that the governing standard is rational basis

review because he is not a member of a protected suspect class. Even assuming, without deciding, that Linder, as a federal employee, was treated differently from other similarly situated private employees and that this difference in the government's treatment of him was caused by his status as a federal employee, it cannot seriously be maintained that the government has no legitimate interest in investigating and pursing criminal wrongdoing by government law enforcement agents and that the search at issue here was not rationally related to that interest. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) (mandatory retirement age for government employee firefighters is reasonably related to the state's legitimate interest in protecting the safety of the public by assuring physical preparedness of its uniformed police); *Treasury Employees v. Von Raab*, 489 U.S. 656 (1989) (drug tests for United States Custom Service employees seeking a transfer or promotion to certain positions is not an unreasonable search in light of the government's legitimate interest in ensuring the compliance of Customs officers with the drug laws); *Doe v. Moore*, 410 F.3d 1337 (7th Cir. 2005) (increased reporting requirements of state Sex Offender Act based on evidence of increased recidivism among a class of felons is rationally related to the state's legitimate interest in protecting its citizens from crime); *Talley v Lane*, 13 F.3d 1031 (7th Cir. 1994) (Chicago Housing Authority does not violate the Fair Housing Act by denying a convicted felon housing near a facility for handicapped persons because the state has a legitimate interest in providing a safe living environment to handicapped individuals

and the Authority's action is reasonably related to that legitimate state interest); *see also Samson v. California*, 547 U.S. 843 (2006) (state law that requires parolees to submit to any search without a warrant is reasonable in light of the state's legitimate interest in protecting its citizens from criminal activity); *Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir. 1989) (drug testing program conducted without a warrant on government employees who came into regular contact with prisoners was justified by the state's legitimate interest in avoiding the dangers resulting from an impaired work force or from drug smuggling). In this case, the government has a legitimate interest in protecting citizens from harm that can be inflicted by its law enforcement officers, individuals who have the means and opportunity to employ abusive tactics against sometimes helpless people. The search of Linder's Blackberry and of his computer files is reasonably related to furthering this legitimate governmental interest because the OIG officers reasonably suspected that the Blackberry and the computer files contained incriminating information, as well as information of ongoing criminal activity. Therefore, assuming only for the sake of argument that Linder, as a federal official, was treated dissimilarly from other private employees and that this difference in treatment was caused by Linder's employment status, the state has a legitimate interest in protecting the public from the harm that can be inflicted by federal agents and the government's search was rationally related to that legitimate governmental interest. For that reason, Linder's equal protection claim must fail.

Linder did not have a reasonable expectation of privacy in his government-issued Blackberry or in his computer files stored on the government server. Linder was aware of the DOJ's and USMS's clear policies regarding the lack of a reasonable expectation of privacy in using both his Blackberry and the government information system. Furthermore, Linder was warned many times about these policies. Indeed, his computer displayed a banner and his Blackberry displayed a disclaimer every time he accessed them. Banners and policies generally eliminate an employee's reasonable expectation of privacy in a government users' network account. Furthermore, policies that authorize the employer to access the employee's workplace diminish any reasonable expectation of privacy that the employee may have in their workplace. In addition, an employee cannot maintain a reasonable expectation of privacy in his electronic data when he is notified that his employer has reserved the right to access or inspect the information stored on his computer. For these reasons, Linder did not have a reasonable expectation of privacy in his Blackberry and the files he stored on the government server. Even if Linder's subjective belief that he did have a reasonable expectation of privacy in these things were to be credited, such an expectation is not one that society is prepared to recognize as reasonable. And in the unlikely event that the search of Linder's Blackberry and computer files did trigger Fourth Amendment protections, no warrant was required because the search falls within two well-recognized exceptions to the warrant requirement. First, the search was

a reasonable government search regarding work-related misconduct, and therefore falls within the "special needs" exception to the warrant requirement. Second, Linder consented to the search by using the Blackberry and the government server aware that he was waiving his right to be free from government searches. For the foregoing reasons, Linder's Motion to Suppress is denied.

### III. Motion to Dismiss the Indictment

When considering a motion to dismiss an indictment this Court assumes all of the facts in the indictment as true and must view all of the facts alleged in the indictment in the light most favorable to the government. *See United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). An indictment is sufficient if it contains the elements of the charged offense, fairly informs the defendant of the charges against him which he must defend against, and enables the defendant to plead double jeopardy as a bar to future prosecutions. *See United States v. Locklear*, 97 F.3d 196, 199 (7th Cir. 1996) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). The relevant question before the Court on a motion to dismiss an indictment is not whether the indictment alleges sufficient facts from which a jury could find that the defendant violated some positive law, but rather whether the government conceivably could produce such evidence at trial. *See United States v. Castor*, 558 F.2d 379, 384 (7th Cir. 1977). This Court is empowered, and indeed it possesses a duty, to dismiss an indictment when it violates the Constitution or laws of the United States. *See United*

*States v. Calzada*, 579 F.2d 1358, 1363 (7th Cir. 1978) (finding that the only remedy for the government's violation of the defendants' Sixth Amendment right to compulsory process of witnesses is dismissal of the indictment). Furthermore the Court may dismiss an indictment on the basis of governmental misconduct pursuant to its supervisory powers; such a dismissal is a prophylactic tool used to discourage future deliberate governmental impropriety. *See United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) (citing *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978)).

A defendant's right to present his own witnesses in establishing a defense is a fundamental element of due process of law and is strictly protected. See *Washington v. Texas*, 388 U.S. 14, 19 (1967). The right encompasses the defendant's Sixth Amendment right to have compulsory process for obtaining witnesses in his favor. *See Id.* at 19-23. The Fifth Amendment to the United States Constitution provides that a criminal defendant shall not be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. X. The Sixth Amendment provides that a criminal defendant "shall enjoy the right. . .to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend VI.

Threats or intimidation made by the government that dissuade a potential defense witness from testifying is a violation of the defendant's right to due process of law and his Sixth Amendment right to compulsory process for obtaining defense witnesses. *See Webb v. Texas*, 409 U.S. 95, 98 (1972). The right to offer testimony of a witness and compel their

attendance is commensurate with the right to present evidence and a defense to a jury. *See Id*. "Just as the accused has the right to confront the prosecution's witness for the purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense." *Id.*; *see also United States v. White*, 454 F.2d 435 (7th Cir. 1971) (adopting the rule articulated in *Webb*). The constitutional right of a criminal defendant to call witnesses in his defense requires that they are free to testify without fear of reprisal or retaliation from the government. *See United States v. Skilling,* 554 F.3d 529, 567 (5th Cir.2009), *vacated in part on other grounds*, 130 S.Ct. 2896 (2010); *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982). Government interferences generally occur when the government instructs a witness not to speak or otherwise artificially restricts defense counsel's access to a witness. *See United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997). The government's conduct must amount to a substantial interference with a witness's free and unhampered determination to testify in order for there to be a violation of due process or the Sixth Amendment. *See Skilling*, 554 F.3d at 567 (quoting *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997)); *United States v. Roach*, 502 F.3d 425, 437 (6th Cir. 2007) (citing *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995); *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005)). To challenge the government's conduct on Sixth Amendment or due process grounds for witness interference the defendant is required to make a "clear showing" that the government instructed the witness not to cooperate with the defense. *See Roach*, 502

F.3d at 437. Government interference with potential defense witnesses requires dismissal of an indictment where a substantial right of the defendant has been jeopardized, such as the right to due process of law secured by the Fifth Amendment or the right to compulsory process of defense witnesses secured by the Sixth Amendment. *See United States v. Wilson*, 715 F.2d 1164, 1169 (7th Cir. 1983). The Court should hold an evidentiary hearing to determine if such a right has indeed been jeopardized when the defendant provides sufficient facts of misconduct to justify the basis for a meaningful evidentiary hearing. *See Id.*

A defendant's Sixth Amendment right to compulsory process is violated when the defendant is deprived of testimony that would have been relevant, material and vital to his defense, and such a deprivation constitutes a violation of the defendant's right to due process of law. See *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982) (quoting *Washington*, 388 U.S. at 16). To succeed on a motion to dismiss an indictment for violating his Sixth Amendment right or his right to due process of law the defendant must make some plausible showing of how the witnesses' testimony would have been both material and favorable to aiding him in his defense. *See Id.* at 859. A violation will be found where the government's actions interfered substantially with a witness's free choice to testify. *See Skilling*, 554 F.3d at 567; *Roach*, 502 F.3d at 437; *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988). Such interference may involve threats of prosecution or other intimidating

conduct. *See Pinto*, 850 F.2d at 932. However, merely informing a potential witness of the consequences of violating the law is insufficient to constitute a Sixth Amendment violation, even if the government's comments dissuade a witness from testifying. *See United States v. Hayward*, 6 F.3d 1241, 1257 (7th Cir. 1997) ("There is nothing wrong with the government informing witnesses of the consequences of breaking the law.").

The prosecution and the defense have an equal right to interview witnesses in criminal proceedings, although the defendant's Sixth Amendment right of access is not violated when a witness chooses on his own accord not to be interviewed by the defense. *See United States v. Bittner*, 728 F.2d 1038, 1041-1042 (8th Cir. 1984). However, the prosecution may not interfere with a witness's free choice to speak with a defense attorney; such interference can amount to a denial of due process or the defendant's Sixth Amendment right. *See Id.* There is a difference between a situation where the government merely advises a potential witness of his right to decline interviews with defense counsel—in such a case, there is no violation of the defendant's Sixth Amendment right of access to the witness, and hence no denial of due process. *See Id.* However, where the government's actions substantially impair a witness's decision to testify, such as by threat, coercion, interference, or intimidation, and the witness's free decision to testify is hampered, the government has denied the defendant of his Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process of defense witnesses,

and the proper remedy for such governmental misconduct may be dismissal of the indictment. *See Calzada*, 579 F.2d at 1363.

Many courts, including the Supreme Court of the United States, have found that the government's interferences with potential defense witnesses violates due process of law or the right to compulsory process of witnesses secured by the Fifth and Sixth Amendments respectively, and have held that dismissal of an indictment may be the appropriate remedy in such cases for the violation of the defendant's constitutional rights. In *Webb*, 409 U.S. 95, the Supreme Court held that where the trial judge singled out a sole defense witness and admonished the witness at length about the dangers of perjury and the witness thereafter refused to testify on behalf of the defendant, the defendant was deprived of his right to due process of law. In *United States v. Muirs*, 149 Fed.Appx. 208, 209 (9th Cir. 2005), the court recognized that "government interference with defense access to witnesses implicates due process" but held that the petitioner was not entitled to a new trial on that basis because he could not show prejudice resulting from the government's interference with potential witnesses. In *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999), the court held that defendants have a right to be free from the prosecution interfering with a witness's freedom of choice about whether to talk to the defense counsel. In *United States v. Heller*, 830 F.2d 150, 152 (11th Cir. 1987), the court held that an IRS agent's comments to an accountant, who was a potential defense witness, coerced the witness to

testify falsely by informing him that unless he testified he would become a defendant himself, and thus violated the defendant's right to due process.  In *Calzada*, 579 F.2d at 1362-1363, the Seventh Circuit held that the defendants' Sixth Amendment right to compulsory process of witnesses was violated by the government deporting the witnesses and that the only remedy was dismissal of the indictment.  In *United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1976), the court held that an FBI agent's comment to a witness, informing him that if he continued with his testimony in aid of the defense he would have "nothing but trouble" in another pending criminal case in Colorado, substantially interfered with the witness's free and unhampered choice to testify, and thus violated the defendant's right to due process of law.  The court also held that such governmental misconduct is not subject to harmless error review because this type of violation is almost always harmful and because it is very difficult for a court to determine when it is not harmful since a court will unlikely be able to determine exactly what evidence would have been adduced had the witness been able to testify freely without interference by the government.  *See Id.* at 1013.  In *International Business Machines Corp. v. Edelstein*, 526 F.2d 37, 44 (2nd Cir. 1975), the court held that "as to interviewing a prospective prosecution witness, our constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it comes from the prosecutor in the case or from a state official or another state action under color of law."  The court therefore granted the petition

for relief from the district court's ruling relating to the conduct of out-of-court interviews and held that such interviews could be conducted confidentially, without the presence of opposing counsel or a reporter, whenever the witness interviewed was willing to proceed. *See Id.* In *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973), the court held that the government's threat to prosecute a witness if he chose to testify violated the defendant's right to due process and could not later be corrected by a statement from the government disclaiming that it would not prosecute the witness. In *United States v. Mendez-Rodriguez*, 450 F.2d 1, 5 (9th Cir. 1971), the court held that the defendant's due process rights were violated by the government deporting several witnesses. In *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966), the court held that the defendant was denied a fair trial where the prosecutor advised the witnesses to the alleged crime not to speak with the defense counsel outside of the prosecutor's presence. Thus, courts across the jurisdictions have uniformly embraced the proposition that governmental interferences with potential defense witnesses may violate a defendant's constitutional rights and that dismissal of the indictment against the defendant may be the appropriate remedy for such violations.

Witness interference or intimidation committed on behalf of the government may be imputed to the prosecution. *See United States v. Lorefice*, 192 F.3d 647, 651-652 (7th Cir. 1999) (citing *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985)). Misconduct by law enforcement agents is indistinguishable from misconduct by the

prosecuting attorneys. *See Id*. A prosecutor can be responsible for misconduct on the part of law enforcement even if the prosecutor is unaware of the misconduct. *See United States ex rel. Smith*, 769 F.2d at 391 (holding a prosecutor responsible for failing to disclose *Brady* material in the possession of law enforcement notwithstanding the prosecutor's ignorance of its existence). The knowledge and conduct of a law enforcement officer can be attributed to the prosecutor if the officer is acting as an arm of the prosecution. *See United States ex rel. Smith*, 769 F.2d at 391 (citing *Wedra v. Thomas*, 671 F.2d 713, 717-18 n.1 (2d Cir. 1982)). *See also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). The rule has been extended to situations in which a fellow prosecutor engages in improper behavior. *See Giglio*, 405 U.S. at 154 (prosecuting attorney is responsible for discovery violations made by a fellow U.S. Attorney and a prosecution witness even though the violations were made without the prosecuting attorney's knowledge).

In this case, Linder argues that U.S. Marshal Darryl McPherson has actively assisted the OIG and DOJ in prosecuting him, while at the same time McPherson directed employees under his command not to speak with Linder and his legal counsel, thereby thwarting Linder's Fifth Amendment right to due process of law and his right to compulsory process of witnesses under the Sixth Amendment. Linder alleges that during

the course of the investigation of him by agents of the OIG, Marshal McPherson and deputies and employees under his control assisted OIG agents and actively investigated Linder further.

Government discovery and defense investigation reveals that on July 12, 2010, four days after the alleged civil rights violation charged in Count One of the indictment, Deputy U.S. Marshals Rich Walenda and Paul Banos were assigned to interview Santiago Solis, the alleged victim. The deputies questioned Solis about the incidents that allegedly occurred on July 8, 2010. The deputies also took a single photograph of Solis.

According to Linder, on July 12, 2010, he was ordered into McPherson's office, whereupon he was met by the Marshal and several other supervisors. Linder asserts that he was confronted and interrogated about the events of July 8, 2010, and that it was McPherson who primarily conducted the interrogation. On July 14, 2010, Deputy Walenda called Solis for a further interview. Also on that date, Walenda and Banos again met with Solis. The deputies proceeded to conduct another interview of Solis. They also took eleven additional photographs of Solis. Information regarding the interviews of Solis as well as the photographs were sent by supervisory Marshal personnel in Chicago to the Office of Internal Investigation. These items were later forwarded to OIG agents.

On July 15, 2010, Linder avers in his Motion that he was again confronted by McPherson and other supervisory personnel. According to Linder, McPherson informed

him that a criminal complaint had been circulated, that a criminal investigation was pending, and that he was being reassigned from the fugitive task force. Between July 30, 2010 and August 2, 2010, Special Agent Shirley of the OIG Chicago Field Office conducted interviews of McPherson and other supervisory personnel. Linder asserts that on August 6, 2010, McPherson approached him in a friendly way and told Linder to come with him. McPherson ushered Linder down the hallway of the 24th floor of the federal building while making small talk. McPherson then stopped in front of a closed door, which he opened and motioned Linder inside where two OIG agents, including Shirley, were standing with outstretched arms holding their badges and credentials. McPherson then quickly exited the room and closed the door behind him, leaving Linder in the room with the two OIG agents. Thereafter the OIG agents attempted to interview Linder.

According to Linder, on September 27, 2010, he was directed into his chief's office where he was ordered to turn over his government-issued Blackberry because OIG agents wanted to take it. Linder argues that he was hesitant to part with his Blackberry because it allegedly contained evidence supporting his innocence and because it contained private and personal data. Linder complied with the order of his supervisor, who in turn gave the Blackberry to the OIG agents. Thereafter, the phone was subjected to forensic testing.

Linder argues that while McPherson was actively assisting the OIG agents in obtaining evidence against him as part of the investigation, he also directly ordered people

under his command to not speak with Linder and his legal counsel.  On January 13, 2012,

the day after Linder was indicted, McPherson sent an email to all employees of the U.S.

Marshal Service within the Northern District of Illinois.  McPherson directed:

> Below are specific rules that must be adhered to by USMS employees during the pendency of federal criminal proceedings against a DUSM [Deputy U.S. Marshal Stephen Linder] from our district, including rules that outline certain limitations on USMS employees with said DUSM.
>
> ***
>
> Any contact with prosecutors and investigators involved in the case must be handled in a polite, professional, and appropriate manner.
>
> USMS employees may not discuss any Government information or any matter about the case with DUSM Linder or anyone else except as authorized or as a matter of official duty.
>
> ***
>
> USMS employees may not discuss the case with DUSM Linder's attorneys or associates except after notifying management and receiving authorization.

(Doc. 26; Exhibit A).

On February 2, 2012, three weeks later, Assistant Chief Deputy U.S. Marshal

Timothy G. McFarden sent an email to all employees of the U.S. Marshal Service within the

Northern District of Illinois.  McFarden recirculated McPherson's "specific rules which

must be adhered to," and further stated to all employees:

> It is incomprehensible that I find it necessary to send this e-mail at all, let alone such a short time after the Marshal sent a very forthright, clearly worded e-mail providing guidance on matters involving DUSM Linder and

the case that is now being litigated in our District Court. I have copied and pasted the Marshal's e-mail below. Please re-read it carefully. If it is confusing, or you find you need clarification on a particular portion, please ask to meet with me in person. I will answer any questions you have and put out further guidance if I believe it will benefit the situation.

[Marshal McPherson's email]

If I become aware of behavior that is contrary to the above listed guidance, it will be dealt with through the U.S. Marshal Service's official discipline process and Employee Relations. The list is *not* all exhaustive. Please take time to review it.

(Doc. 26; Exhibit B). Additionally McFarden attached to the email a "Table of USMS and DOJ Offenses." (*Id*.)

Linder's defense attorney asserts that he has attempted to conduct a defense investigation in order to prepare pretrial motions and for trial. Counsel avers that he has attempted to speak with U.S. Marshal personnel. Counsel states that he has been told either that prospective witnesses could not or would not speak with him or that they would only speak to him "off the record." Linder hired a licensed private investigator, James Delorto, who attempted to interview nine U.S. Marshal Service personnel, including McPherson. Eight of the prospective witnesses either told Delorto that they could not or would not speak with him or they simply refused to speak with him or did not return his telephone calls after he identified himself and his purpose for contacting them. Some prospective witnesses told Delorto to contact the OIG's office or the U.S. Attorney's Office. One prospective witness indicated that he might speak with Delorto and Linder's defense

lawyer but only with the assistance of an attorney.

Linder argues that based on these facts it is unsurprising that his counsel has been unable to conduct interviews with prospective witnesses. Linder argues that the emails sent by McPherson and McFarden were threatening and intimidating, and chilled any witness from discussing the case with the defense. Linder argues that McPherson and those under his control acted in concert with the OIG in conducting its investigation of him. Therefore, Linder argues that prospective witnesses have been unduly influenced by the government into not cooperating with Linder and his defense, and that the government's conduct in this case has artificially restricted defense counsel's access to prospective witnesses and has substantially interfered with their free and unhampered determination to testify. Linder asserts that dismissal of the indictment is the appropriate remedy here. He argues that the damage has already been done, not only to himself, but also to the prospective witnesses. The witnesses, he argues, have been threatened with the loss of their employment as well as potential incarceration. In addition, he argues that the witnesses' memories have faded. He avers that they will not tell the truth now even if the Marshal withdraws his rule. He asserts that the witnesses are scared, and that he and his lawyer have lost the opportunity to interview them without restriction or fear of retaliation by the government. Linder claims that his Fifth Amendment right to due process of law is broken here and is beyond repair.

The government argues that McPherson was not a part of the prosecution team. It argues that after the OIG began its investigation, McPherson had only limited contact with the investigating agents. His contact, according to the government, was principally intended to ensure that OIG agents did not schedule an interview with any DUSM when the DUSM was needed on-duty elsewhere. The government argues that McPherson did not instruct DUSMs that they had to submit to OIG interviews, but that to the contrary, he informed DUSMs that such interviews were voluntary. McPherson also informed OIG agents about when Linder's schedule would permit an interview, but the government asserts that he did not instruct Linder to submit to the interview and that he did not participate in the interview himself. In short, the government argues that McPherson did not investigate this matter, did not gather evidence, and provided no advice, guidance, or thoughts on the merits of the investigation and that therefore he was not part of the prosecution team.

The government contends that when McPherson learned that Linder had been charged he contacted USMS Office of General Counsel to seek guidance on what he should tell the USMS employees in the Northern District of Illinois. The Office of General Counsel drafted eleven guidelines, including the guideline stating that "USMS employees may not discuss the case with DUSM Linder's attorneys or associates except after notifying management and receiving authorization." The government argues that although

McPherson did not draft this guideline he interpreted it to be geared towards managing scheduling issues during duty hours. The government claims that because the guideline does not clearly specify that DUSMs are only required to seek permission if they wish to meet with the defendant's attorney during duty hours McPherson intends to re-issue it and clarify the guideline.

The government states that in sending the email guidance McPherson did not intend to threaten, intimidate, or discourage any DUSM from speaking with Linder's attorney. No DUSM sought his permission to meet with Linder's attorney, but the government suggests that if they had McPherson would never have denied any such request. The government asserts that McPherson received no direction from the prosecution team regarding the Office of General Counsel's guidance, and never consulted with or informed the prosecution team prior to sending it.

The government argues that McPherson is not part of the prosecution team, and is therefore not a part of the "government" for the purposes of determining whether the government violated Linder's constitutional rights. The government argues that from the inception of this investigation McPherson has been a neutral party. It argues that his contact with OIG agents during the investigation was to ensure that his agency's mission was not disrupted by the investigation. The government contends that McPherson's neutral role as head of his agency in the Northern District continued during the prosecution

of this matter, when he sought counsel from the Office of the General Counsel on what instructions to provide USMS employees. The government argues that because the "government" (i.e., the prosecution team) and McPherson have separate missions—the former to investigate and now prosecute Linder, the latter to ensure that his agency's law enforcement duties are not disrupted by the case—the government and McPherson did not consult with each other during the investigation and now prosecution of this case. Specifically, the government contends that McPherson did not confer with or inform the government prior to sending the guidelines. As such, the government concludes that McPherson's email cannot be imputed to the prosecution team because he did not and never purported to act on the government's behalf. *See Kyles*, 514 U.S. at 437.

Furthermore, the government argues that the guidelines sent by McPherson do not violate Linder's constitutional rights. The government contends that even if the email is imputed to the government, the guidelines do not in any way interfere with Linder's ability to conduct an investigation. The government asserts that the guidelines are a matter of internal USMS agency policy and reflect the judgment of USMS's management of how it sees fit to conduct the agency during the pendency of this case. The government argues that these internal USMS personnel management issues are separate and apart from the prosecution of this case and do not violate Linder's constitutional rights. The government argues that the disputed guidelines here directing DUSMs to seek authorization from

USMS management before meeting with defense counsel does not constitute the requisite "clear showing" necessary to demonstrate that the government instructed witnesses to not cooperate with defense counsel. First, the government asserts that the plain language of the guidelines does not prohibit DUSMs from meeting with defense counsel. The government argues that the fact that DUSMs were asked to seek authorization from McPherson does not, in and of itself, clearly show that the government interfered with defense counsel's investigation. Second, the government argues that McPherson never told any DUSM that they could not meet with or speak to defense counsel. No DUSM asked McPherson for permission, but the government asserts that he would not have denied any such request. The government argues that absent McPherson denying a DUSM's request to meet with defense counsel or a clear indication that he would have denied such a request, Linder's constitutional rights have not been violated. Third, the government argues that Linder has failed to show that any witness refused to meet with defense counsel because of the guidelines. The government argues that the reason that the guidelines were resent was because there was intra-office gossip about who was a "rat." The government contends that USMS management was rightly concerned about possible witness intimidation and office morale.

Finally, the government argues that even if Linder's rights were infringed the correct remedy is a curative instruction. The government states that McPherson is clarifying the

guidelines so that they will specify that they are only directed towards requests to meet with defense counsel during duty hours. The government contends that this is consistent with McPherson's interpretation of the guideline, with how interviews were handled with OIG agents during the investigation, and with the other guidance provided that is directed towards DUSM conduct during duty hours. The government cites a case from the First Circuit to support its contention that a curative instruction is all that is required to remedy the government's violation of Linder's constitutional rights. *See Kines v. Butterworth*, 669 F.2d 6 (1st Cir. 1981). In *Kines* a state police officer told witness not to speak with defense counsel. The trial court denied the defendant's pretrial motion to dismiss the indictment, and instead instructed the prosecutor to tell the witnesses of their right to meet with defense counsel "as they wish or not wish." *Id.* at 10. After receiving the curative instruction, the witnesses still refused to meet with defense counsel, and the defendant was convicted at trial. *See Id.* In reviewing the defendant's petition for a writ of habeas corpus the appellate court rejected the defendant's argument that pretrial access to witnesses denied him a fair trial. The court found that the defendant had not suffered prejudice from the temporary lack of pretrial access to witnesses. *See Id.* at 11. In reaching its decision, the court noted in part that the prosecution turned over grand jury minutes and other discovery materials for those witnesses which allowed the defendant to prepare for trial, and that the witnesses at issue were not eyewitnesses to the incident. *See Id.* at 10-11. The

government argues that the clarification of the guideline at issue here will inform DUSMs that they only need to seek guidance if they choose to meet with defense counsel during duty hours. The government states that defense counsel will receive as part of discovery witness statements for testifying government witnesses. Furthermore, the government argues that at least some of the DUSMs who refused interviews with defense counsel are not eyewitnesses, while there are several other eyewitnesses who are not employed by the USMS. *Kines* is distinguishable from the instant case because in *Kines* the witnesses testified at a prior suppression hearing, where the defense had an opportunity to cross-examine the witnesses. *See Id.* at 10. Furthermore, in *Kines* the court rested its decision on the lack of prejudice experienced by the defendant in that case, whereas here the prejudicial effect of the emails and the resulting refusal of the DUSMs to be interviewed by defense counsel is unknown.

Based on the partially disputed factual record in this case, it cannot be determined at this time whether Linder's Fifth Amendment right to due process of law or his Sixth Amendment right to compulsory process of witnesses have been violated. It is conceivable based on the facts alleged by Linder that McPherson, and those acting under his control, were acting as an arm of the prosecution and thus constitute the "government" for the purpose of determining whether the government interfered with Linder's constitutional rights. *See Lorefice*, 192 F.3d at 651-652. It is also plausible that McPherson's and

McFarden's emails interfered with the witnesses free and unhampered determination to testify on Linder's behalf.  *See Burke*, 425 F.3d at 411; *Skilling*, 554 F.3d at 567 (quoting *Thompson*, 130 F.3d at 686); *Roach*, 502 F.3d at 437 (citing *Pierce*, 62 F.3d at 833).   The email can be construed as instilling in the witnesses fear of reprisal or retaliation from the government if they discussed the case with Linder's defense counsel, which would violate Linder's constitutional rights.  *See Skilling*, 554 F.3d at 567; *Blackwell*, 694 F.2d at 1334.  Here it is not impossible, on the facts presented by Linder, to conclude that the government instructed witnesses not to speak with his defense counsel and otherwise artificially restricted his defense counsel's access to the witnesses by sending the guidelines and the follow-up email, thus violating Linder's rights.  *See Agostino*, 132 F.3d at 1191.  Here Linder has supplied sufficient facts such that an evidentiary hearing should be conducted to determine whether his rights have been jeopardized.  *See Wilson*, 715 F.2d at 1169.

An evidentiary hearing is required in this case to resolve the issue of whether the indictment against Linder should be dismissed.  On the record currently before the Court it is not possible to ascertain many facts that will be dispositive of the instant Motion.  First, the Court must determine whether McPherson was acting as part of the "government" when he emailed the guidelines.  The degree of participation of McPherson and the people under his command with the investigation is a necessary fact that must be adduced.  It must be determined whether the guidelines can be imputed onto the prosecution.  The

neutrality of McPherson, those under his command, and the guidelines that he sent must be ascertained. In addition, it may be useful to know if the directive sent by McPherson were mere guidelines or "specific rules," as the opening of his email states they are. The voluntariness of the interviews by OIG, both of DUSMs and of Linder, is a factual issue that is in dispute and must be resolved. Also, the temporal duration of the alleged interference is an important fact in deciding what the proper remedy is if Linder's rights are found to have been violated. Furthermore, it is necessary to know whether any DUSMs actually felt threatened or intimidated by the emails and for that reason chose not to speak with Linder's defense counsel. In addition, in determining whether a curative instruction is the appropriate remedy, the Court will need to have more information about the memories of the witnesses and their ability to recall events that happened in the past to determine if the emails were prejudicial to Linder. Most importantly, the Court has to determine whether the government interfered with a potential defense witness's free choice to testify, something that can only be ascertained after the Court conducts an evidentiary hearing. For the reasons set forth above, an evidentiary hearing is granted on Linder's Motion to Dismiss the Indictment.

## IV. Conclusion

For the reasons set forth above, Linder's Motion for a Bill of Particulars is granted. The government is hereby ordered to supply Linder with a bill of particulars as to Counts

Two and Four of the indictment pursuant to Federal Rule of Criminal Procedure 7(f).

Linder's Motion to Suppress is denied. An evidentiary hearing is ordered on Linder's

Motion to Dismiss the Indictment so that the Court can ascertain whether Linder's Fifth

and Sixth Amendment rights have been violated by the government's conduct in this case

and whether dismissal of the indictment is the appropriate remedy if they have been

violated.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 9, 2012